Case number 241436, Veronica Gardner et al. v. Flagstar Bank FSB or arguments not to exceed 15 minutes per side. Mrs. Garland, you may proceed for the appellant. May it please the court, Jessica Garland for Veronica Gardner. With the court's permission, I'd like to reserve three minutes for rebuttal. There are two types of bank fees at issue in this appeal. The first is known as Authorized Positive Purportedly Settled Negative or APPSN, a specific type of overdraft fee that banks charge despite the fact that when a consumer authorized a transaction, their account had a sufficient available balance to cover the transaction. The second is what's known as a non-sufficient fund fee or an NSF fee, which banks assess when they decline a transaction because of insufficient funds. Flagstar, however, assessed multiple non-sufficient fund fees on a single transaction a consumer only authorized once. But if a bank is going to charge these types of fees, it has to clearly disclose them to consumers in its contract. In this case, the district court held that Flagstar's 2015 contract was ambiguous and did not clearly authorize the bank to charge either of these fees. But it then went astray. To resolve Ms. Gardner's claims about these charges under Flagstar's ambiguous contract, the court applied PRITZ, a Michigan Court of Appeals case about construing unambiguous contracts. This legal error infected the court's decision on both fees. The principle in PRITZ about unambiguous contracts is inconsistent with the controlling framework outlined in CLAP for resolving- The point there is that your client didn't purport to fully read the agreement, right? Just generally, that's the point that the district court found important here, right? Yes, Your Honor. As a factual matter, I think she did read the agreement. She read it. She skimmed it. She said she glanced at it, and she did form an understanding of it. But regardless, that principle in PRITZ doesn't apply here. Are there any consequences to not reading the agreement? For an unambiguous contract, I think if you don't read the agreement before you sign it, you both suffer any consequences of, you know, if it turns out it was clear, or if you don't read it and it turns out it's clear in your favor, then you also get the benefit. So you just don't know what will happen. That's true, Your Honor. But that framework for analyzing an ambiguous contract, like we have here, is quite different than what the Michigan Court of Appeals outlined in PRITZ and Commerce for analyzing unambiguous contracts. I understood her testimony to be, or statements to be, that on this issue of whether she read it or not, that she did say she, quote, read over the terms and conditions, looked, quote, looked over the terms and conditions, and skimmed. So I guess if it's important, what are we to make of this? She, your position, she, I think you said she did read the agreement as opposed to having not read it. Yes, Your Honor, our position is that she read it and that she formed an understanding and intent when she signed that contract that matches the same understanding and intent that she advances today. But we don't actually think she needed to have formed that intent in order to get this case to a fact finder to resolve the ambiguity. In CLAP, the Michigan Supreme Court outlined what happens when you have an ambiguous contract. The court noted it's a question of fact and that the jury should look to extrinsic evidence as well as the meaning of the contract and the context in which the contract is made to understand what someone reasonably would have understood the contract to mean. Do I understand, counsel, that this disclosure guide, I guess would you agree that that disclosure guide that came out late 2017, whenever that was, made it less ambiguous? Do you agree with that? There's two different claims and so for one, I do agree. As to the APPSN fee, we are not contesting that the 2018 contract made it unambiguous. However, the district court made clear that she found the 2015 contract ambiguous and Ms. Gardner has claims under that contract. So, as to APPSN fees, we are only arguing about the 2015 contract. Pre-17, 18. Exactly. As to the NSF fees, again, the court found the initial contract was ambiguous and that the updated contract, the amendments made in 2017 and 18 did not fix the ambiguity. It said there was, quote, an existing ambiguity. So as to that contract, we are arguing that even under the amendment, it's still ambiguous because that's what the district court held and if the district court then erred in applying PRITZ to resolve the ambiguity, PRITZ doesn't apply here. So we ask this court to overturn the grant of summary judgment on that specific basis and then to remit it back to the district court so that a fact finder can analyze the ambiguity in the 2018 contract as related to the non-sufficient fund fees as well as in the 2015 contract as related to the APPSN fees. Could I ask you about these 2 September 2016 overdraft fees? Yes, Your Honor. So your friend on the other side, as you know, argues that we should not consider those overdraft fees because they were disclosed or came out in the expert testimony affidavit, I believe. How do you respond? I guess bottom line. Yes, Your Honor. So in the motion to dismiss proceedings, Flagstar never argued anything about the 2018 amendment. Then in its motion for summary judgment, it argued that any fees charged after 2018 wouldn't be governed by that ambiguous 2015 contract. It attached to its own motion, Ms. Garner's October 2016 bank statement. It's actually that bank statement which Flagstar attached to it and added to the docket itself that shows on its face the APPSN fees. Ms. Garner then noted that there were APPSN fees based off of that bank statement and she pointed to her expert that explained at length why just on the face of that statement you can tell they are APPSN fees. Flagstar's never disputed that the account statement it attached is in fact her accurate account statement or that it does reflect that she was charged two APPSN fees in 2016. The court then never struck the expert testimony nor did Flagstar ever ask it to below. Rather, the court noted that to the extent she was making the argument about APPSN fees under the 2015 contract, it was going to apply PRITZ to resolve the ambiguity. As I noted, that was an error. But the court did not dispute whether there were in fact fees charged before 2018. Did you call those two specific transactions to the district court's attention at summary judgment? We did, Your Honor. In the opposition to summary judgment, page ID 2777 and 2797-98, that's page 4 of the We did discuss it at length. Those two specific, you quoted those two, the O's Coney Island or whatever it is. You mentioned those specifically. We cited specifically to the expert's declaration explaining that there were two fees before and in the expert's declaration, yes, he pointed to the Coney Island fee and to the McDonald's fee at length. And again, that was referencing the bank statement that Flagstar itself had introduced. And then in their reply, Flagstar didn't dispute that those were in fact APPSN fees or that they were somehow improperly brought up by Ms. Gardner in her opposition to summary judgment. Yes, Your Honor. On the second category of fees, NSF fees or however, representative fees, the amended contract after the post-disclosure guide says item means any order, instruction, or authorization to pay. I think I have that right. Yes. Can you tell me if I don't? And I guess my question is, what's ambiguous about that? I mean, is it any order, instruction, or authorization to pay? Could that be a merchant? Yeah, that's my question. Yes, Your Honor. So it says any order, instruction, or authorization to pay, transfer or withdraw funds or money from your account. And in the context of the contract, it never indicates that that could mean anything other than Ms. Gardner or the consumer's instruction or authorization to pay. So the contract is clear that there will be only one non-sufficient fund fee charged per item. And so in the context of saying there's one fee charged per item, the other parts of the contract that mention the term item only are doing so in reference to something that Ms. Gardner herself would authorize. In that context, there's no reason for a reasonable consumer to anticipate that there would be a representment by a merchant that for some reason could charge another non-sufficient fund fee that she never instructed or authorized. And so I think it's both that language and in the context of the contract as a whole as well. For example, I think under Flagstar's reading, if a fraudster had taken a check that she had and kept on reprocessing it 10 times, that would be someone else reprocessing it. And if that could lawfully charge an NSF fee, she could have to be liable for those charges. That doesn't really make sense in the context of the contract, and so there's a better way to read the contract that's reasonable. The fraud example seems, couldn't a bank just override that if there's criminality? There's no fraud, right? There's no fraud. There's no allegation there's fraud in these representments, right? No. But we're saying that there's a way to read the contract reasonably in the context of a whole that doesn't involve that type of complication. Isn't it somewhat common for merchants to sometimes come back and if something gets denied the first time, they think there's an error on the bank's end or something happened to the technology or something and they represent it. That's not wholly uncommon, is it? I'm not sure how common it is, but you know this area pretty well. Well, I think the question is whether it would be reasonable for a consumer reading the contract as a whole where there's no indication that there would be another non-sufficient fund fee. She's already charged once for that attempt that she authorized, so she gave her check to the merchant. It was returned. She's already charged a fee. The question is, here she was charged three additional fees. And so the question is just is that reasonable or not? And the district court found that her reading was reasonable because it wasn't unambiguous on its face. And so because the contract doesn't unambiguously clearly warn the consumer that they have to be aware of this possible additional fee, endless cycle of fees, that it's reasonable for her not to expect it. And so all we're arguing here is that the district court was right about this ambiguity and if we remove the legal error that the district court infected its judgment with by applying Pritz, which doesn't apply here, if this court overturns that ruling on summary judgment, which it should, then this should be remanded to the district court, again, which found that it was ambiguous to decide and it was sent to the fact finder to resolve the ambiguity. Thank you. Or is there the rest of my time for a bottle? Thank you very much. Good afternoon. May it please the court. Carolyn Giordano on behalf of Apelli Flagstar Bank. I think I have a lot of disagreements with what my friend has said today, so I'll just sort of lunge into it. We're here on Ms. Gardner's claim that the bank breached the terms of an account agreement she voluntarily entered into with the bank. And that claim, in this case, was not governed by the 2015 agreement that the district court held was ambiguous at the motion to dismiss stage. Ms. Gardner's claim throughout this entire case has always related to the two fees alleged in the complaint that were in November and December 2019, years after that 2015 agreement was updated. The district court's primary holding in this case, which Ms. Gardner doesn't want to focus on, is that all of those updated terms were unambiguous, as to the APSN and as to the NSF as well. Just to remind me, the Leo's, Coney Island, and McDonald's, that's pre-? Leo's, Coney Island, and McDonald's, I'm not remembering. If it was alleged in the complaint, it was in November and- I know, but we're beyond the complaint. We're at summary judgment. There's a bunch of statements submitted at summary judgment, including your bank submitted all these statements that then their expert relied on. Well, so let's talk about the expert, because I'd like to talk about that declaration. So the only thing that they have to support Ms. Gardner's assertion on appeal that the 2015 agreement applies to her claims is this allegation in Mr. Olson's affidavit, which was filed with the summary judgment response brief. The declaration states that it's Mr. Olson's opinion that Ms. Gardner was likely assessed APSN fees on September 26, 2016, before the updates were effective. So that declaration does not save Ms. Gardner's claims, and there are a lot of reasons why the district court was correct. Does it reference the two? Just to make sure we're all on the same page, we're talking about these two. I don't know, McDonald's and Leo's, Coney Island is the easiest way for me to refer to it, but I don't know if the case is- I believe that it is McDonald's and Leo's, Coney Island. So those two may have probably were referenced by the expert, and then the briefing references that part of the expert report? Yes, the briefing references that part of the expert report, but we would first say that this expert report was only filed with the response to the second motion for summary judgment we filed, in this case, a year after the close of plaintiff-specific discovery. How would you counsel make that point to the district court? Well, here is what I would say, Your Honor. I don't think we waived that argument. I think we did preserve it. If you go back and look at the summary judgment briefing, you'll find that Ms. Gardner's response brief raised a multiplicity of new issues in the response brief for the first time. One of those was the Olson declaration, but it was by no means the only one. And so it was at the absolute top of our mind to argue that you cannot overcome summary judgment by raising new issues in the response brief. And you will see that there were new claims alleged under Reg E. There were new claims, unconscionability claims, all of which we had to address in the seven-page double-spaced reply brief. I don't understand. So you move for summary judgment, and they respond? But they responded with an expert who was never disclosed throughout discovery fees. Did you argue that the expert wasn't disclosed and that it shouldn't be considered for that reason? We argued that they were raising new positions on summary judgment that had never been made in the case before. Did the district court accept that? I don't think that the district court considered the affidavit because it wasn't proper to consider it. What did he say? He wasn't considering it? No, he didn't. Or did he rule? He didn't, Your Honor. But he didn't consider it, and we think that it was beyond untimely and waived. Those are really district court issues. But in the first place, those feel like district court issues, how to manage the filings, who was on time with what, what to consider. Well, Your Honor, I would also like to just talk about what's in the declaration. So even if the court did consider this declaration, the declaration we do not feel is significant probative evidence supporting Ms. Gardner's claims. So first of all, as my friend said, we're looking at two different kinds of claims. We have the APSN fee claims and the NSF fees. So this declaration does not address any NSF fee claims at all pre-updates for Ms. Gardner. So on the APSN fee claims, it talks about this one fee that was likely assessed in 2016, September 26, 2016, which is the McDonald's Leo's Coney Island. But Mr. Olson was unable to conclusively determine this at the time of summary judgment. Then the plaintiff blames that failure on Flagstar and says that Mr. Olson was unable to get the transactional data to back that up. We would point the, that's not correct. We would point the court to page 43 of our brief, note seven, we did not withhold transactional data. Again, this data was not requested until the end of discovery. Even then we gave it to them and we produced it to them in February of 23. They didn't follow up on that saying this isn't enough until after our second motion for summary judgment was filed. And so to the extent they're saying that this is enough, even though he's himself telling you that he can't tell there's an APSN fee there, we would ask the court to take note of that. And I would also add, and I don't think this is clear from what was just argued, it's not correct to say that the bank concedes that Ms. Gardner was assessed APSN fees in the bank statement that's being referenced. We don't concede that. Contrary to what she's saying, she's pointing to this bank statement. You cannot tell from a bank statement whether a fee was an APSN fee. An exact question that on remand the district court should figure out, or a trial, the trial of the, that sounds like a disagreement. I mean, our position, Your Honor, is that this is extremely untimely and that the plaintiff had, you know, this case was pending for three years. Did you move to exclude the expert based on untimeliness? We did not. No. And the account statement is something you guys submitted. I just want to make sure I'm right. So the account statement was not submitted for any purpose of showing anything to do with those fees. It was submitted in connection with our first motion for summary judgment that we had to draw, and we had to refile a second motion because a new plaintiff was added. But we, did we file it? Yes. You produced a discovery also. We did. Yes. Yes. The reason you're doing it isn't necessarily that important. Okay. You're introducing it for one point, but I think Judge Wirtz's point is that it was in the record fairly. And for me, this goes back to, I think, one of the very first things you said about her complaint, and what her complaint has been all along, and what transactions she's been my recollection or understanding of the complaint is she said, as an example, the transactions are, you know, that she, and then she cited the November 19 transactions. Then you guys, you guys get to depose, there's a deposition. I mean, if there's some confusion about which transactions are at issue, why not ask the question then? Well, you know, there, there wasn't, we didn't know that there was any confusion. I mean, we asked about which transactions were at issue throughout discovery. These were the only ones that were disclosed up until the response to the second motion for summary judgment. And so we didn't, we didn't know that these were being alleged as, as, as these types of fees, you know, they, you know, I mean, the plaintiff does have some responsibility in discovery. Of course, we asked what fees are at issue. And so we couldn't, you know, know that. And if we had known earlier in the case, you know, I think we might have done things differently. We were going, you know, going along on this case for years when these are the only fees that have been referenced, right? And she certainly never brought up these other fees in her deposition. So if I may, I'd like to address the, the Pritz and the Comrass cases because it seemed that the court was interested in them. So our position here is even if the 2015 agreement applied, which we believe that the district court did not hold that it did, this, the, the extrinsic evidence showed that Ms. Gardner did not read the relevant terms at the time of contracting and she could not survive summary judgment based on an alleged ambiguity in those terms. Now I heard the court, you know, asking, did she read it? Did she say she read it? Did she skim it? I think at summary judgment, you have to look at the totality of evidence at the time. Why don't we just go to the legal question? Let's assume she didn't read it. Okay. Let's assume that she didn't read it. Okay. Okay. So.  So the law in Michigan is, is under Pritz. It's clear that a party who has not read the contents of a contract before signing it may not claim that their intention was different from that stated in the writing. And that's the Pritz case. And that case does not say that that principle should only be applied to allegedly unambiguous contracts. That's a, that's a proposition that the plaintiff has given you, but it's not stated in the case law. A case that extends it to ambiguous cases or makes it clear that it's applied? So, so I think that the case talks about intent. In the Pritz case, the court examined extrinsic evidence of contractual intent, including in the form of party testimony when looking at breach of contract claims. Both courts specifically analyzed intent in Pritz and Comras and looked at that. Pritz's instructive right involved the interpretation of an indemnity clause between a lessor and a lessee. The court specifically dealt with the issue of intent. And yes, it did find that the trial court had erred in finding that the contract was ambiguous. But in the second part of the opinion, the court is looking at the surrounding circumstances and the alternative, suggesting even if the party's intent is relevant, the evidence of the party's intent as shown by the lessee's testimony that he didn't read the relevant indemnity clause was consistent only with a willingness to accept the terms of whatever indemnity clause were being offered by the lessor. So here, Ms. Gardner testified she didn't search for anything, you know, related to inflexor with charge overdraft fees. She couldn't identify one provision that the bank breached. She couldn't identify one provision regarding ODNSF fees. I mean, I'm not fully following, but just on the legal point, I understand if the contract is unambiguous, if we all, if it says red, if we know it means red, you know, it's not going to be a defense that the signer didn't read the contract because everyone knows what that means. But if it's ambiguous, then the benefit of reading it is fairly limited because you, it's, we don't know what it necessarily means. And that, to me, seems fundamentally different and why a different rule might apply in that  Well, Your Honor, I would say that our position is the Pritz case doesn't say that. And I think looking at the case in its entirety rather than looking at that one phrase, you know, the one, to look, you have to look at what the case is doing and the case is looking at intent. And there's no indication that that phrase consistent with only with a willingness to accept whatever terms are being offered by the lessor. There's no, there's no suggestion that that is only related to contracts that a court has earlier found unambiguous. This is conceptually, just first principle. Say there's no cases. Why? Why? Why? If the contract is ambiguous, is it, does it necessarily matter if you've read it or not? What are you going to glean from the ambiguous contract? Well, because, because the intent of the parties is important when you're looking at a contract and you have to think about what the intent of the parties were when they entered into the contract. I mean, that, there is a lot of Michigan, Michigan law that, that talks about that. And I would actually cite to the Clapp case, if we're looking at what, what contractual intent is being induced at the summary judgment stage, Clapp tells you that if the contract is ambiguous, extrinsic evidence, particularly evidence, which would indicate the contemporaneous understanding of the parties is relevant. And so we're talking here about Ms. Gardner's contemporaneous understanding of the contract, right? And, and, and this is something that we believe is absolutely relevant under Michigan law here. And, and, and the, and the Clapp, you know, the Clapp case doesn't, doesn't caveat that either and say, this is, you know, this is only the case when you're talking about ambiguous or unambiguous contracts. To look to extrinsic evidence, then is there some showstopper evidence that you think you have that, in other words, you're, you're making the point that you can look at it. No, I mean, I think, I think the extrinsic evidence here is a deposition to a testimony that the plaintiff did not review the relevant terms of the contract at the time of contracting. That, that's the... So you're, so meaning that she could not, there was no intent she could have... Right. She, she didn't have an intent that was based on the writing, as this case law, this Michigan case law is telling you that it must be, right? It's not an... So what the other side is arguing is, is there's an absence of extrinsic evidence of intent and so you should apply contra preferentum, right? We don't agree with that because you have extrinsic evidence on both sides here and we believe that is what the, the district court concluded. If I may, I would like to go back to the issue of the item presentment language and the, you know, the idea that the district court held that there was an existing ambiguity as to the updated language regarding NSF fees. We don't agree that the district court held that that updated language was ambiguous regarding item presentment fees. So the, the phrase, if you look at the opinion, the phrase that the plaintiff is focused on in making that conclusion is the existing ambiguity regarding item presentment fees cannot be resolved in her favor. So although it is true that that phrase, existing ambiguity, is not the clearest where it appears in the opinion, a reading of the opinion as a whole, in its entirety, we believe shows that the district court is referring there to the ambiguity it had found in the 2015 agreement. So let me walk you through this. The reality is that we're dealing here with a very long opinion in which the court is talking about two different contracts at two different times. It's a, it's a stretch to say that that phrase, existing ambiguity, is the holding of the district court. There is an entire section here construing the language of the disclosure guide updates, which is page ID 4458 through 68. The opinion does not say the post-update language regarding NSF fees is ambiguous. If that's what the district court wanted to hold, it sure didn't spell that out, right? What the district court did do was present a discussion of the updated fees, the clarity of the updated terms, and then gave you the transitional, conditional statement. Even if the agreement were ambiguous, though, her, her claim still could not survive summary judgment. So the, obviously, the underlying assumption there, if you read this as a whole, is that the agreement is not ambiguous, and there's no carve-out there for the NSF fees. The district court specifically noted that the definition of NSF fees was updated, as, as, as was discussed with, with my friend, to, and the definition of item was clarified to be any order, instruction, authorization to pay, transfer, withdraw funds, or money from your account. So it's, it's not our position that the district court found that NSF fee language was ambiguous post-updates. I think that's, that's about my time, and so I'll... Yeah, thank you, and I appreciate your first points about the fact that the litigation was moving very quickly, and lots of things were happening. So we'll be sure to go back and look at the record and see how all of that lines up. I appreciate it. Thank you. Appreciate your arguments. And we can hear some rebuttal. Thank you. Just to that point about the litigation moving, I just wanted to note briefly that it wasn't until their second motion for summary judgment that they argued that the 2018 contract had clarified any ambiguity, so her examples post-2018 weren't relevant, and that's why she then pointed in her opposition to summary judgment about the 2016 examples. But I'd like to focus on why the district court's application of print simply doesn't make sense, specifically because of the implications. Under the decision below, that would mean that any time a consumer is presented with any form contract, if they don't carefully parse the words of the contract before signing, they could be held to whatever meaning of the contract the corporation later asserts it understood the contract to mean. But there's no other court in Michigan or anywhere else that I could find has ever said a consumer has to show they thoroughly read the text of an ambiguous form contract in order to advance their reasonable interpretation. I think that's very clearly not the case in Michigan because of CLAP. So PRITZ is a Michigan Court of Appeals case in 1981, and it just, it cites a Michigan Supreme Court case, Commerce, from the 1970s, that makes, states the truism that when it comes to unambiguous contracts, a party can't point to extrinsic evidence. You know, that includes they can't say they put their head in the sand and chose not to read the contract so they could break a, you know, a binding contract, for example. And the court in Commerce, you know, specifically said, you know, under the parole evidence rule to analyze in the contract, in the context of unambiguous contracts, we can't look to extrinsic evidence. And then in 2003, so, you know, this is two decades after PRITZ, the Michigan Supreme Court in CLAP, you know, noted that the structure for analyzing a debate about an unambiguous contract does not apply to an ambiguous contract. It specifically noted that the parole evidence rule, as applied to unambiguous contracts, isn't applicable here, meaning the underlying principle for Commerce and PRITZ does not apply to analyzing ambiguous contracts. And in CLAP, the court made clear a party doesn't need any extrinsic evidence demonstrating that they either read the contract or formed the intent of a contract in order to advance their interpretation of the contract. So this court also held in Royal and in Lomre where they said it doesn't matter if there's no extrinsic evidence. Nevertheless, a party can still advance their interpretation of the contract and a court or the fact finder will analyze that interpretation. That is how courts have long understood analyzing unambiguous contracts and we think that is how this court should do so today. Thank you, Your Honor. Thank you very much. Thanks to both parties. It was a well-argued case. The case will be submitted.